**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kayla Moore, | No. CV-21-00101-TUC-CKJ |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

This matter was referred to Magistrate Judge Maria S. Aguilera, pursuant to Rules of Practice for the United States District Court, District of Arizona (Local Rules), Rule (Civil) 72.1(a).   On July 14, 2022, the Magistrate Judge issued a Report and Recommendation (R&R).  She recommends that the Court affirm the denial of disability benefits issued by the Social Security Administration (Commissioner). For reasons explained below, the Court does not adopt this recommendation. Instead, the Court remands the case back to the Commissioner for reconsideration of Plaintiff's Residual Functional Capacity (RFC) and eligibility for disability benefits.

STANDARD OF REVIEW

The duties of the district court in connection with a R&R by a Magistrate Judge are set forth in Rule 72 of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1). The district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1).  Where the parties object to a R&R, "'[a] judge of the [district] court shall make

a *de novo* determination of those portions of the [R&R] to which objection is made.'" *Thomas v. Arn*, 474 U.S. 140, 149-50 (1985) (quoting 28 U.S.C. § 636(b)(1)).

This Court's ruling is a *de novo* determination as to those portions of the R&R to which there are objections.  28 U.S.C. § 636(b)(1)(C); *Wang v. Masaitis*, 416 F.3d 992, 1000 n. 13 (9th Cir.2005); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121-22 (9th Cir.2003) (*en banc*).  To the extent that no objection has been made, arguments to the contrary have been waived.  Fed. R. Civ. P. 72; see 28 U.S.C. § 636(b)(1) (objections are waived if they are not filed within fourteen days of service of the R&R), *see also McCall v. Andrus*, 628 F.2d 1185, 1187 (9th Cir. 1980) (failure to object to Magistrate's report waives right to do so on appeal); Advisory Committee Notes to Fed. R. Civ. P. 72 (citing *Campbell v. United States Dist. Court*, 501 F.2d 196, 206 (9th Cir. 1974) (when no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation)).

The parties were sent copies of the R&R and instructed that, pursuant to 28 U.S.C. § 636(b)(1), they had 14 days to file written objections.  *See also*, Fed. R. Civ. P. 72 (party objecting to the recommended disposition has fourteen (14) days to file specific, written objections). The Court has considered the objections filed by the Plaintiff, and the parties' briefs considered by the Magistrate Judge in deciding the merits of Plaintiff's appeal of the Commissioner's decision finding her not disabled.

## R&R & OBJECTIONS

The Plaintiff objects to the R&R for two reasons. First, Plaintiff argues that the Magistrate Judge failed to recognize the ALJ erred by failing to account for Plaintiff's "marked" limitations in interacting with others and instead applied only moderate limitations. Second, the Magistrate Judge erred by concluding the ALJ accounted for all Plaintiff's symptoms and found her not disabled when instead the ALJ found the Plaintiff's statements concerning severity were not entirely consistent with the medical evidence and other evidence in the record. In her Opening Brief, the Plaintiff argued that the ALJ improperly discounted Plaintiff's symptom testimony because he failed to offer specific,

1   clear and convincing reasons for rejecting claimant's testimony about the severity of her

2   symptoms.  (Opening Brief (Doc. 22) at 11-18.)

3        Plaintiff, who was 21 years old, filed her application for disability insurance benefits

4   in 2016, seeking coverage from an onset date of May 2012 through the last insured date of

5   June 30, 2014. The issue is whether Plaintiff is disabled, defined as: the inability to engage

6   in any substantial gainful activity by reason of any medically determinable physical or

7   mental impairment or combination of impairments that can be expected to result in death

8   or that has lasted or can be expected to last for a continuous period of not less than 12

9   months. (Decision issued June 1, 2020 (Decision) (Doc. 19-3) at 15.)[1]

10       The R&R fails to summarize the record in any detail, and this Court does not intend

11  to do so here—except for those portions of the record set out by the Administrative Law

12  Judge (ALJ) in the decision.

13       Plaintiff, a younger individual, had a stroke shortly before being discharged from

14  the military. She was treated in Korea, and the VA treatment notes reflect that on May 12,

15  2012, she was admitted for acute care as follows: "Three-week history of inability to speak,

16  does not appear to be emotionally troubled by this "la belle indifference." Patient is

17  otherwise neurologically intact, is able to indicate by texting on her iPhone, is able to

18  enunciate "uh-huh" and "ummm". She is not SI or HI. I think she has somatization d/o or

19  other psychogenic d/o and that her loss of voice is not organic in nature. She was seen by

20  social worker who made an urgent mental health appointment for Monday at 9am, which

21  she agreed to attend. . . . Diagnosis: Aphasia Likely due to somatization d/o NOS." *Id.* at

22  20. She indicated losing her ability to speak while stationed in Korea "but did not seek

23  treatment for three weeks. During that time, she was released from duty, returned to the

24  United States and was living alone in an apartment for two weeks." *Id.* (cleaned up).

25       Claimant was examined on May 24, 2012, and "reported living independently in an

26  apartment and did not appear to be distressed about her inability to speak. She had a

27  generally unremarkable mental status examination except for blasé affect, apathetic mood

28  ───────────────────
[1] *See* CM/ECF documents and page citations.

1    and poor insight. She was diagnosed with a personality disorder and somatoform disorder."

2    *Id.* (cleaned up).

3         In September 2012, Plaintiff underwent an evaluation for speech therapy, with a

4    brain MRI reflecting chronic appearing infarct with encephalomalcia of the left frontal and

5    temporal jobs. *Id.* Claimant reported her speech had returned and she estimated about 45%

6    improvement; she was enrolled in one class at PCC and wanted to pursue acting when her

7    speech returned. *Id.* "Speech language pathologist Jillian Golder noted the claimant had no

8    evidence of word finding difficulties. Ms. Golder noted 80% intelligibility in speech,

9    supplemented by writing to clarify. Further therapy was recommended to improve her

10   speech." *Id.*

11        In October 2012, Plaintiff was referred for a psychiatric evaluation in October 2012

12   secondary to a November 2011 military sexual assault. She reported alcohol was involved,

13   and she couldn't remember the incident because she blacked out. Although she notified the

14   authorities immediately and a rape kit was completed, the perpetrator was not prosecuted.

15   Like her reaction to the stroke, "she indicated she had no concerns or symptoms related to

16   the incident. Claimant indicated she was attending school and did not require any treatment.

17   She was assigned a GAF of 75." *Id.*

18        In April 2013, at the insistence of her providers, she was examined for psychiatric

19   impairment. She reported the sexual assault. "She presented in a child like manner, had

20   inappropriate affect at times, poor insight and fair judgment but otherwise had an

21   unremarkable mental status examination." *Id.* at 21. These provider notes are as follows:

22   in June 2013, she reported trying to get a job but was having difficulty due to poor speech

23   and lack of job skills, indicated poor sleep but noted playing video games with a friend in

24   the middle of the night, mental status examination same with a GAF of 58, referred for a

25   work therapy consultation for employment services;  in July 2013, she continued to report

26   poor sleep due to her cats and their feeding schedule, feeling angry and stressed causing

27   her to cry. *Id.*

28

In August 2013, Plaintiff underwent a work therapy consultation, reported living independently with a roommate, described her limiting factor as her inability to speak properly, relied on a bus for transportation, applied for customer service jobs at Gamestop and Hot Topic with a long-term goal of being an actress, reported having no physical limitations for employment. The social worker, Allison Davis, indicated that although the claimant had some speech difficulty, she was understandable; she assigned a GAF score of 60. Claimant apparently missed her follow-on appointment, due to report of oversleeping, and her employment services case was closed. *Id.*

In August 2013, Plaintiff underwent a neurological examination secondary to employment services. "Dr. Steven Rapcsak found no physical limitations including normal gait, normal strength and normal reflexes. He recommended speech therapy to improve her speech limitations." *Id.*

"During her August 20, 2013, counseling appointment, claimant reported she applied for a job online providing nude photos, which she believed would help raise her self esteem." *Id.* Social worker, Sue Dolence, warned her of the consequences of this type of activity, and "noted the claimant displayed 'magical thinking' about the matter. Claimant also reported she tried to return to college but was unable to pass assessment test, which the social worker noted appeared inconsistent with a prior report that she was taking a college course at Pima County. Ms. Dolence suggested claimant undergo further psychological testing however after she failed to follow up on scheduling an appointment and the referral was closed." *Id.* (cleaned up).

On January 15, 2014, Plaintiff was again evaluated for speech therapy. She excused her previous failure to follow through with therapy because she did not want to complete the therapy activities; she reported wanting to start therapy so she could pursue acting. She indicated she tried to apply for work at a department store but was denied due to her speech limitations. "Speech pathologist Robin Mirante found mild verbal apraxia characterized by intermittent mostly medial substitutions, vowel distortions and difficulty sound sequencing increasing complex words and multi-syllable words," which could be improved if Plaintiff

slowed her rate but she was reluctant to do so; claimant had no difficulty understanding and while she reported difficulty with concentration at times, claimant reported she could read for two hours at a time, depending on the subject matter. Ms. Mirante found no evidence of comprehension difficulties or difficulty following directions. Prognosis was good with practice. *Id.* at 21-22.

Claimant followed up February 5, 2014, reporting she had not been doing practice exercises because she was moving and cleaning. She reported "looking for jobs at places like Game stop, Hot Optic, Spencer's and Target because they were more likely to hire someone with her hair color (tinted purple) and a lip piercing." *Id.* at 22 (cleaned up). She was referred for vocational rehabilitation services for job placement assistance. *Id.*

On May 12, 2014, Plaintiff underwent formal psychiatric testing related to vocational rehabilitation. She reported being depressed since the age of 12. Objective testing found as follows: "Overall, Pt exhibited strengths and weaknesses relative to her age peers in terms of attention and memory skills, demonstrates working memory deficits, difficulty repeating numbers in the reverse order, difficulty with simple analogies such as 'collar is to neck as watch is to... (wrist)' and 'on is to start, as off is to... (stop).' Her performance on this measure is suggestive of reduced linguistic cognitive flexibility. Visual auditory learning (30 minutes post immediate recall), Pt scored within normal limits; verbal ability lies within one standard deviation from the mean; whereas cognitive efficiency lies two standard deviations below the mean. Per results, Pt's primary area of weakness is in working memory and generative naming. Difficulty with generative naming is also suggestive of reduced cognitive flexibility and word retrieval." *Id.* (cleaned up).

As of July 14, 2014, Plaintiff was released from therapy "after having gained maximum benefit from speech therapy." She was able to solve math problems with two denominations of coins like seven nickels and two quarters with 60% accuracy. If given an opportunity to check her work, she increased accuracy to 90%. With three denominations, she demonstrated difficulty remembering the amount and denominations, with 40% accuracy even with repetition. When allowed to write an external memory cue, accuracy

increased to 80%. She was able to self-correct four of her responses during the activity, demonstrating good self-monitoring. *Id.*

"On October 8, 2014, shortly after her date last insured, the claimant underwent an extensive psychological evaluation." *Id.* at 23. She reported the above history, generally, adding that "she had attended five counseling sessions but stopped after the counselor tried to talk her out of posting nude photographs on the internet. She reported paranoia, mistrust and social isolation; After a 3.5 hour examination, as well as review of the claimant's chart and objective test results, Katherine Brazaitis, psychology intern overseen by Staff Psychologist, Nadine Cole, specifically rejected the diagnosis of somatoform disorder." *Id.* (cleaned up).

"Rather, claimant was found to have paranoid personality disorder, borderline personality disorder and persistent depressive disorder. Evaluator Brazaitis found that the claimant would likely benefit from vocational rehabilitative service, anger management treatment, and general therapy. Plaintiff reported paranoia, mistrust and social isolation; Plaintiff was observe to be fully oriented, alert, had appropriate eye contact, was open and forthcoming during the examination and at times appeared markedly anxious." *Id.* (cleaned up).

At the hearing on December 3, 2019, Medical Expert (ME), Dr. Debra Pollack, testified that the evidence supported the claimant's allegation of an infarct in the left frontal lobe, which would affect her dominant right side, occurring in May 2012. The ME accepted Plaintiff's report that initially she was unable to speak, which improved over time and now Plaintiff has some speech impediment, but her speech was clear and understandable at the hearing. The ME relied on medical notes from Dr. Pollack regarding Plaintiff's complaints of neck and back pain, with MRI's being unremarkable. The ME confirmed "a cognitive disturbance," which according to Dr. Pollack indicated Petitioner "should have limited contact with the public, can perform simple 1-2 step tasks only and should avoid exposure to unprotected heights (ladders, ropes, scaffolds)." *Id.* at 19. The ME specified that "limitations provided in the consultative examination of Dr. Maryanne Belton would be

accommodated by limitation to simple 1-2 step tasks." *Id.* Regarding the use of a cane, the record was unclear as to why she was falling and the evidence did not reflect a condition that would warrant the use of a cane as that is generally for balance problems, not to prevent falling, and she did not start using a cane until well after the relevant period of time for determining disability. *Id.*

This is the record provided by the ALJ in the decision. He concluded the Plaintiff has the following severe impairments: neurocognitive disorder caused by a stroke, depressive disorder, anxiety disorder, paranoid personality disorder and borderline personality disorder. He concluded that she had no single impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Therefore, the ALJ had to determine whether the Plaintiff has the RFC to perform the requirements of her past relevant work and if not, whether she is able to do any other work considering her RFC, age, education, and work experience. If claimant is able to work, she is not disabled.

In concluding the Plaintiff had no single impairment or combination of impairments rendering her disabled, the ALJ opined, "[w]ith regard to her mental impairments, the claimant has moderate limitations in understanding, remembering and applying information; in ability to concentrate, persist or maintain pace; in ability to adapt and manage oneself. She has marked limitation in social interaction with others." *Id.* at 18. Based on this finding of a "marked" limitation in social interaction with others, the Plaintiff challenges the ALJ's RFC as reflecting only moderate limitations, not marked limitations.

The RFC, which Plaintiff challenges, is as follows: Plaintiff "has the ability to perform a full range of work at all exertional levels but with the following nonexertional limitations: Due to her history of stroke, claimant should have no exposure to hazards such as ladders, unprotected heights and moving machinery. She has the *mental capacity to perform work where interpersonal contact is only incidental to the work performed, i.e., that interpersonal contact may be routine, but claimant is not frequently required to consult with or involve co-workers and public contact is not a primary component of the work.*

*Such public contact that occurs is limited to that which is merely incidental to the job and generally brief, infrequent and superficial. Performed tasks limited to tasks consistent with unskilled work.* No production or fast paced work." *Id.* (emphasis added).

The Court does not address whether physical limitations in Plaintiff's ability to navigate work hazards affects Plaintiff's ability to perform a full range of work, but notes that the ALJ asked the ME: "Would there be any physical limitations for your RFC in terms of whether sedentary, light or medium work would apply?" She answered that the Plaintiff could certainly do "light work." (Administrative Record (AR), Hearing TR 12/3/2019 (Doc. 19-3) at 67-68) (emphasis added). The ME also testified to further limitations related to "speech/cognitive disturbance and those would be to have limited contact with public, both in person and on the phone, and simple one and two-step tasks only." *Id.* at 67 (emphasis added). Without any explanation, the ALJ's RFC includes neither "light work" nor "one and two-step tasks."

The ALJ asked the ME whether there was any support in the medical record that the Plaintiff "would need memory aides, like day planners, check lists to assist in organization and retrieval of queues?" She replied in the negative if things were kept simple as she suggested (one and two-step tasks). *Id.* at 69.

The ALJ asked the Vocational Expert (VE) to consider the following: "That claimant is limited to a range of light work where all hazards such as ladders, ropes, scaffolding, unprotected heights, moving machinery are removed, that she's allowed to use an assistive device and has the mental capacity to perform work where interpersonal contact is only incidental to the work performed, i.e., that it may not be routine, the claimant is frequently – and is not frequently required to consult with coworkers or the public and public contact is not a  primary component of the job. Such public contact that occurs is merely incidental to the job, brief, infrequent, and superficial. Performed tasks are limited to simple one to two-step tasks and claimant is allowed to use memory aides. Supervision need not be direct but readily available. Minimal changes permitted. No production work. Would there be jobs for a person with that degree of limitation?" *Id.* at 83.

The VE responded in the negative because of the indication for a device- guessing the use of a cane? The VE continued that the Petitioner would be more appropriately placed "in a sedentary capacity along with the one to two-step tasks that further limits her." *Id.* at 84. But the need for memory aids sounds more like someone who needs to be in a sheltered environment or supported work setting with an accommodation, which would not be a competitive work environment. *Id.*

On May 5, 2020, the ALJ held a supplemental hearing "in part because of a defect in a hypothetical that was posed" and some problems with trying to fit it to the situation when he went to write the decision; he wanted clarification in the information that he had before writing the decision.  ((AR, Hearing TR 5/5/2020 (Doc. 19-3) at 32.) The ALJ described the need to clarify the RFC without considering an assistive device, the cane, because the period of eligibility predated the use of the cane.  *Id.* at 34-37. The Plaintiff's attorney correctly noted that the VE opined "what was largely work preclusive was the memory aids and readily available supervision sounding like sheltered work and that's – regardless of whether a cane was necessary or not." *Id.* at 37.

After hearing more testimony from the Plaintiff, the ALJ decided to "stay with the prior vocational testimony" and propose a couple of new hypotheticals. He asked the VE to consider the capability of performing a range of light work, excepting hazards like ladders and moving machinery, and to not do production or fast-paced work. The Plaintiff's mental capacity limitations were restated as they were stated at the December 3, 2019, hearing. He changed the hypothetical by adding "performed tasks are limited to those consistent with unskilled work and omitted the limitation of one and two-step tasks. *Id.* at 53. This time the VE responded that there was one job in the DOT[2] which could be performed by such a person: janitor/cleaner. *Id.* When the need for memory aids was added into the hypothetical, the VE responded that "supported employment [] is not competitive." *Id.* at 54.

---

[2] Dictionary of Occupational Titles.

1       The ALJ rejected the need for a sheltered work environment. He was not persuaded

2   that the Plaintiff had "poor insight and judgment, poor motivation, personality tendencies

3   to be passive yet hostile, and difficulty comprehending her own deficiencies, [and] all

4   speak to a person who needs a sheltered environment in order to succeed in the workplace."

5   (Decision (Doc, 19-3) at 23. He found that "claimant may experience some of the

6   aforementioned symptomology," but "she has also been able to live independently, and at

7   times with a roommate, navigate the bus system on her own, apply for jobs and attend

8   physician appointments." *Id.* The ALJ concluded that the "degree to which her symptoms

9   may be limiting have been accommodated by the residual functional capacity outlined in

10  paragraph five." *Id.* "In sum, the [] residual functional capacity assessment is supported by

11  the opinions of the state agency experts and the medical evidence of record. There is no

12  treating source opinion that the claimant is more limited than as provided in the above

13  residual functional capacity assessment." *Id.* at 24. A review of the state agency expert

14  opinions reflect they opined the Plaintiff has "moderate" limitations in memory and social

15  interaction with others. (AR (Doc. 19-4) Ex. 2A at 3-13: Disability Determination

16  Explanation, 1/18/2016, and Ex. 4A at 15-26: Reconsideration Disability Determination

17  Explanation, 04/06/2017.)

18      According to the Objection, the ALJ's RFC describes moderate limitations which

19  do not coincide with his step three assessment that Plaintiff has "marked" limitation in

20  social interaction with others. The Plaintiff refers to cases where the type of limitations

21  imposed here by the ALJ were imposed where a person had "moderate" social interaction

22  limitations, meaning their ability to interact with others was "fair" as compared to

23  "marked," meaning "seriously limited." (Opening Brief (Doc. 22) at 10 (citing Listings

24  12.00)). *See Shaibi v. Berryhill*, 883 F.3d 1102, 1107 (9th Cir. 2017) (interacting

25  occasionally with coworkers and supervisors was consistent with doctor's opinion that

26  social limitations were moderate, rather than mild or marked); *Fowler v. Berryhill*, No.

27  1:17-CV-01253-EPG, 2018 WL 611660, at *2 (E.D. Cal. Nov. 21, 2018) (finding

28  limitation to "occasional interaction with the general public, coworkers, and supervisors

did not fully adopt physician's opinion of "marked" limitation); *Jack W. v. Comm'r*, No. 3:19-CV-00507-CL, 2021 WL 879043, at *16 (D. Or. Mar. 9, 2021) (finding of no public contact and occasional contact with coworkers and supervisors did not adequately encompass well-supported opinion that claimant had marked limitations in ability to respond appropriately with supervisors, get along with coworkers, and maintain socially acceptable behavior). The Court recognizes that the medical opinions in this case are of a moderate impairment and accepts these cases only for the purpose of showing that there is a disparity between moderate and marked limitations.

The Court does not accept the Magistrate Judge's assertion that the social security terms moderate and marked are fluid. In short, these are terms of art, included in various social security regulations, administrative guidelines, and listings, to be used uniformly when determining whether a person is disabled or not. *See* (Objection (Doc. 29) at 2 (citing *Heckler v. Campbell,* 461 U.S. 458, 461 (1983) (discussing need for uniformity in use of Medical-Vocational Guidelines)). The two terms are not fungible. While the Commissioner asserts that the "marked" finding at step 3 is not determinative of the RFC developed in step 4, the Plaintiff correctly points out that the ALJ offers no reason or explanation for finding she "has marked limitation in social interaction" when considering whether her impairment meets or equals one of the listed criteria for disability but finds it poses only moderate limitations to her RFC to work.

The ALJ does not explain why he limited the RFC to tasks consistent with "unskilled" work instead of to **"**simple one and two-step tasks only." As noted above the "one and two-step tasks only" limitation was given by the ME at the hearing. It is especially important because the ME explained her opinion that memory aids were not necessary depended on "if things were kept simple as she suggested." *Supra.* at 9. The hypothetical given to the VE during the December 3, 2019, hearing included the "one and two-step tasks only" limitation and resulted in the conclusion that there were no jobs she could perform because of the need for an assistive device. The confusion between which assistive device, the cane or memory aides, led to the supplemental May 5, 2020, hearing, whereat the ALJ

changed the hypothetical to omit the cane, changed the limitation to light work, and changed "simple one and two-step tasks only" to unskilled work. Then, the VE found only one job in the DOT that could be performed: janitor/cleaner.

Unskilled work encompasses jobs involving only one and two-step tasks. "'Unskilled work,' however, as used by the DOT and the Commissioner's regulations, does not necessarily conflate with jobs that involve only simple one-to two-step instructions." *Gonzales v. Astrue,* 10-CV-1330-SKO, 2012 WL 14002 *13 (January 4, 2012). These are two distinct considerations, with "unskilled" speaking more to the issue of the level of vocational preparation necessary to perform the job rather than the issue of the job's simplicity. *Id.* Important to Plaintiff's case, not all "unskilled" jobs are limited to the simplest level of work involving only one or two step instructions. *Id.* at *10-14 (collecting cases reflecting approaches taken by the district courts in the Ninth Circuit). *See also Meissl v. Barnhart,* 403 F. Supp.2d 981 (Calif. 2005); *Hackett v. Barnhart,* 395 F.3d 1168, 1176 (10th Cir. 2005); *Lucy v. Chater,* 113 F.3d 905, 909 (8th Cir. 1997).

The Court finds that the ALJ failed to give any reason for why he adopted moderate limitations in the RFC when he had concluded Plaintiff had marked impairments in interacting with others. The impact of this omission in the record is compounded by the ALJ's failure to explain why the RFC included "unskilled work" instead of "only one and two-step tasks."

The Court does not agree with the Plaintiff's second objection to the R&R. The Magistrate Judge did not conclude that the ALJ based the RFC on an accounting of all the Plaintiff's symptoms. The Magistrate Judge found "that the ALJ accounted for the relevant parts of Plaintiff's symptom testimony." (R&R (Doc. 28) at 4.) In other words, the RFC was based on a finding that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Decision (Doc. 19-3) at 19-20.)

1    The Court finds, however, that the ALJ failed to explain his accounting in the

2    decision. Instead, he included a recitation of the record as summarized above. The ALJ

3    concluded: "The undersigned finds the claimant has the above residual functional capacity

4    assessment, which is supported by the totality of the medical evidence, objective findings,

5    and the opinions of the individuals who have had the opportunity to assess the claimant

6    and her abilities, as well as the subjective allegations of the claimant. Furthermore, her

7    symptoms are not so severe as to prohibit her from performing all basic work activities.

8    The residual functional capacity set forth above addresses the claimant's symptoms to the

9    degree supported by the evidence." *Id.* at 23.

10   The ALJ follows this conclusion by noting that state agency consultants concluded

11   she was capable of unskilled work; another consultive examination was done almost five

12   years after her date last insured and thus not particularly instructive, and he rejected any

13   need for sheltered employment because she was able to live independently and at times

14   with a roommate, could navigate the bus system on her own, could apply for jobs and attend

15   physician appointments. Beyond these statements there is no discussion, analysis, or

16   assessment of the record. In other words, the ALJ failed to give the reasons for choosing

17   between the limitation of "unskilled" work given by the state agency consultants and the

18   more refined opinion by the ME, who reviewed the entirety of the record including those

19   of the agency consultants, which limited the Plaintiff to performing "only one to two-step

20   tasks." As explained above, this "blunderbuss" approach is error, especially in this case

21   where the facts reflect a need to split very fine hairs. *Gonzales,* 2012 WL 14002 at * 11.

22   Under the DOT, there is a distinction between level 1 reasoning ability to "[apply

23   commonsense understanding to carry out simple one-or two-step instructions. . . . " and

24   level 2 ability to carry out detailed but uninvolved written or oral instructions. . . . or level

25   3 to carry out instructions furnished in written, oral, or diagrammatic form. . . ." Unskilled

26   work encompasses all three but clearly the Plaintiff's reasoning abilities do not. *Id.* at *9.

27   The Court finds that the ALJ committed legal error at step four in developing the

28   RFC for the Plaintiff including, without any explanation, "moderate" instead of "marked"

- 14 -

limitations in interacting with others and replaced the limitation of "only one and two-step tasks" with "unskilled" work. This error carried over to step five in the hypothetical the ALJ proffered to secure the VE testimony that the Plaintiff has the ability to perform one job, janitor/cleaner, under the DOT. Even with the supplemental hearing, the ALJ failed to clarify ambiguity in the record related to the Plaintiff's RFC. He failed to give reasons for his conclusion that Plaintiff could perform a full range of unskilled work. The Court does not reach the issue of whether he gave clear and convincing reasons for rejecting evidence that she needed a sheltered work environment. As noted by the ME, the simplicity of the work tasks determines the Plaintiff's ability to perform them without memory aids. As the record stands reported in the decision, the ALJ's finding that Plaintiff is not disabled is not supported by substantial evidence. The Court does not adopt the Magistrate Judge's recommendation to affirm the decision by the Commissioner.

The Court remands the case to the Commissioner for further development of the record, including but not limited to looking at the relationship between Plaintiff's limitations in interacting with others and her ability to perform only simple one and two-step tasks.

CONCLUSION

After *de novo* review of the issues raised in Plaintiff's Objection, the Court does not agree with the findings of fact and conclusions of law made by the Magistrate Judge in the R&R. The Court does not adopt the R&R. For reasons explained in this Order, the Court remands the case to the Commissioner.

**Accordingly**,

**IT IS ORDERED** that after a full and independent review of the record, in respect to the objections, the Magistrate Judge's Report and Recommendation (Doc. 28) is not adopted by the Court.

**IT IS FURTHER ORDERED** that the case is REMANDED to the Commissioner of the Social Security Administration.

/////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter Judgment, accordingly, and close this case.

Dated this 13th day of September, 2022.

Honorable Cindy K. Jorgenson
United States District Judge